Good morning. May it please the court, John Patton on behalf of the appellants, I'd like to request three minutes that I'll reserve for rebuttal. The district court erred in this case in granting summary judgment on a disputed issue over the party's intent in entering into a contract that on its face was plainly legal. We refer to those contracts in our briefing as the key documents. They are a shareholder's agreement and a fiduciary agreement. The district court improperly weighed the evidence and decided as a matter of law that the parties entered into the key agreements with a single purpose or intent that was illegal, rendering them unenforceable and void. That was improper because the party's intent or purpose in entering into the key agreements is a fact issue that a jury must decide. And indeed, this court has on multiple occasions explicitly recognized that cases like this one that involve a matter of intent are particularly inappropriate for summary judgment. The result of the district court's decision is that appellee is rewarded, gets out of an agreement that he made and acknowledged for years. And so we ask this court to reverse that decision. Today, in addition, of course, to answering any questions the court has, I want to focus on three points. First, for all the attention on the tax strategy part of entering into these key agreements, that the parties had a separate additional purpose or object in entering into them. Number two, that the district court erred in treating the key documents as fraudulently backdated versus dated retroactively as of. And number three, that the secretly recorded calls that Mr. Mutaguchi has presented and that the district court relied on almost exclusively in deciding to grant summary judgment are far from dispositive in this case. So, first of all, for all the attention on the tax strategy part of entering into these key agreements, so I'll start there. The recorded calls, the district court pretty much decided the case based on the statements of Mr. Urso and Mr. Fulmer in those recorded calls. That was improper because there was substantial evidence to the contrary for the statements that the district court relied on in deciding that the recorded calls were end-of-story dispositive as a matter of law of the party's intent in entering into the key agreements. First of all... Well, first of all, do you dispute that those calls are accurate and they occurred? We don't dispute that those calls contain conversations with Mr. Urso and Mr. Fulmer. We did in the summary judgment evidence, and it is in their declarations, that they're highly suspect that all of the recordings were provided, and significantly that there are many other conversations that took place in the planning, brainstorming, and ultimate strategy that was developed that were omitted. So, the recorded calls, it's highly contested that they contain the full record of all of the relevant conversations and statements by Mr. Urso and Mr. Fulmer and Mr. Mutaguchi. But you think there's a phone call out there that said, oh, never mind, we were just kidding? Well, I think in fairness it is, as Mr. Urso and Mr. Fulmer explain in their declarations, which are detailed and extensive, this was a strategy and a plan that evolved over time. And I think it's important to note that some of those statements on those calls, which I will concede are unsavory and certainly are evidentiarily valuable to the other side in arguing this was illegal. But this is summary judgment, and there's a whole other side of it that's in my client's declarations. Those declarations detail how this strategy evolved over time. Don't we have case law that says self-serving declarations is not enough to defeat summary judgment? So the case law, Your Honor, from the Ninth Circuit is pretty clear that declarations, as long as they are not conclusory, are sufficient to defeat summary judgment. So even if it's self-serving, the case law pretty much recognizes most declarations are self-serving in the sense that it is... Why would you put it forward if it's not self-serving? Exactly. But as long as it states facts and not conclusory statements. So what facts shows that what was recorded on the call is not what actually happened? There are a lot of facts in the declarations. So they go through that separately in other conversations with Mr. Mutaguchi that were not recorded, later in time, closer to when the documents were signed, that they made clear to him not to lie to the NTA. And that the strategy that evolved... That's not inconsistent with this illegal purpose. Well, Your Honor, I think that it is in the sense that the strategy overall, stepping back, was here to create documents that were retroactively effective, that captured, to my first point that I'll get to in a bit, that there was an intention among these parties for Mr. Urso and Mr. Fulmer to be part of TPP from the inception. The long history here between... From the inception in 2000, 2001? Correct, Your Honor. They had a relationship that went back to the 90s for business, and they helped Mr. Mutaguchi come to the United States, set him up with a family who invested in his business. He then took those proceeds, and then they helped him get connected in Utah with some of these connections to companies he made investments in. And so he recognized over the years, this is in their declarations, as part of the details of how this relationship came, that he recognized over the years, hey, I owe you guys a lot, and you are part of TPP, and I will share in the success of TPP with you. So there was that prior intent that existed all the way back to the forming of the company. Is there any evidence of that prior intent from the time, closer in time to when it occurred? Well, the declarations from Mr. Urso and Mr. Fulmer set out those facts, and those are statements of Mr. Mutaguchi. And so to circle back to Your Honor's question earlier... It's oral evidence. Those declarations contain factual statements about things that Mr. Mutaguchi said to them that the parties did. What did they do back in 2000 that would cause him to give up 50% ownership in this company? Well, Your Honor, the whole success of TPP was in many ways born out of Mr. Mutaguchi's relationship and friendship with Mr. Urso and Mr. Fulmer. And he acknowledged that over the years, that they helped him get a green card to come to Utah, they set him up, they connected him with the source of the capital. And I think it's important to note, TPP is a company that just invests in startup companies. So it's not an operating business. So these are investments that essentially Mr. Urso and Mr. Fulmer helped source. And Mr. Mutaguchi recognized, hey, you have a lot of value you've added here. You have a lot of contribution. I owe you a lot. And so that is what justifies them sharing in it. You say help source. Do you mean they put money into it? They did not, Your Honor. They helped source the investment that went into it. In other words, they connected him initially, and this is in the declaration of Mr. Urso, they connected him with a wealthy family that invested with him. And what you see through TPP is a snowball of- How much did he invest initially in 2000? I believe it's not in the record. I believe it's about $2 million. So he's going to invest $2 million, and he's going to give half of that to his friends just because of their friendship. It just seems not plausible. A couple points on that, Your Honor. Number one, I think, is that it starts from zero, and the recognition is, hey, I wouldn't be here at all without the help of you guys. So whether this turns into nothing or it turns into a home run, which it did, I'm going to share in that success with you. Number two, part of the deal, as the record shows, was that Mr. Mutaguchi had an option he could exercise to actually get effectively 90 percent of the economic benefits of TPP. So the idea that, oh, he just would give up half of that value is not really the deal if he wanted to honor the agreements and exercise that option. He could. Wasn't your client a practicing lawyer at the time in 2000? I think he indicates in his declaration he was not a practicing lawyer. He was barred in 2000. But he was barred, and he had previously been a tax lawyer. And so his declaration states- It didn't occur to him to put all this stuff in writing in 2000. Well, I mean, I think the declarations indicate this is a close friendship. It's a trusting relationship at the time. Obviously- Not so close that he was being secretly recorded, but- Well, that was certainly surprising and unfortunate to Mr. Ursa and Mr. Fulmer. But I think, you know, part of this- What I also want to emphasize before I concede and save some time for rebuttal is that it is very important that the way this strategy evolved was that the documents would state they were effective as of the prior date. And the district court essentially viewed that as synonymous with backdated fraudulently. And there's a key difference as our expert, Mr. Higawa from Japan, tax expert, has in his expert report. When you see language as of, it should be a red flag that, hey, when was this signed? When did you guys actually enter into this? Is it retroactively effective? And that fact, I think, especially for summary judgment where the inferences go in our favor, is really important to show that if the purpose of these documents was to defraud the Japanese government, you would have fraudulently backdated them. You would have put on there a date, you know, signed December 2000 and put the dates there. You wouldn't have said entered into as of that date. And so this strategy was designed as the declaration's detail to come up with a strategy where you- Can you explain the one statement by Mr. Urso? We have to have a letter that says it's really 90-5-5, you know, not 50-25-25. How is that? How do you square that with anything? That is the option I referred to earlier, which is the option for Mr. Mutaguchi to exercise where he gets 90 percent of the economic benefits of the company. And it's a recognition, as your recoiled that, why would he get 50- why would my clients get 50 percent of the company? That's too much. And so ultimately where the strategy went with the advice of Japanese tax counsel was that in Japan, unlike in the United States, an option like that is not deemed exercised at the time that the NTA looks at it. So if the IRS looks at that, they deem it to be exercised. They would deem it that Mr. Mutaguchi owns 90 percent. But in Japan, it's different. In Japan, it's not deemed exercised, so you hold the 50 percent they needed. Okay, you're under three minutes. You want to serve the rest? I will.  Good morning. May it please the Court. My name is Andrew Devote, and I represent the respondent, Mr. Mutaguchi. Your Honors, we don't come before the Court this morning to celebrate the conduct of any of the parties involved in this case. But we do come before this Court and ask this Court to affirm the District Court's grant of summary judgment because it is clear from the evidence, including the more than four hours of phone calls, that the illegal purpose in this case was to mislead the Japanese tax authority as to the ownership of Omnicom in 2009. And the California law, to the point of reward, California law and the California Supreme Court has said in Haruko Takuchi v. Schmuck that the rule that the courts will not enforce illegal agreements is not applied in order to correct injustice between the parties, but from regard for a higher interest that the public whose welfare demands that certain transactions be discouraged. I wanted to turn, Your Honor, counsel talked about the declaration and the calls, and I wanted to talk a little bit about this with Your Honor. Those calls and those calls and counsel or the parties' admissions demonstrate that illegal purpose. Your Honor, the District Court highlighted some of those calls. That opinion could have been two or three times longer. I would encourage Your Honors to listen to those four hours of calls if Your Honors haven't had the opportunity. They make clear chapter and verse from the start. I shouldn't say from the start. After Mr. Takagi, the Japanese lawyer, leaves at about 48 minutes, Mr. Urso and Mr. Fulmer key in exactly on the issue, that it's going to come down to, quote, creating fictional ownership. And in their brief and in their affidavit, they talk about they're brainstorming. They are brainstorming in that first call. They're absolutely brainstorming like the need to trial advocacy upside down triangle. They start with, we can't use a because you can research when a corporation comes into effect. Quote, we should use public trust or trust because you don't file trust publicly. You can just create your own documents and say, hey, these were there since 2005. And then to Your Honor's point, they do go on, Mr. Urso, as a lawyer, and I think that is particularly important, more than five times on that first call alone, Takagi can't be a part of this. They not only do they say he can't be a part of it, they say he can be a part of the residency question. So that knowledge and awareness, they are splitting between two tasks that will come up before the Japanese Tax Authority, a question of Mr. Mutaguchi's residency versus this TPP issue. And he says, quote, so because he's a Japanese lawyer, he can't lie. We can't say to him, hey, Nobu owns TPP capital. We're going to get creative and take it out of his name and put it someone else's name, blah, blah, blah. You don't want to put him in that position. He risks, this is a lawyer, he risks his entire career and his job. It's just too risky. And it's not just quotes like that, Your Honor. It's those quotes throughout all of the calls. We'll be fine if the three of us stick together. That Urso says he can't consult other tax experts because they have the same disclosure obligations as Mr. Takagi. The same problem they run into and why they can't tell Mr. Takagi. And similarly, Your Honor, at the January 30th phone call, as this particularly telling point when Your Honors were asking about the time and going back to 2000, Mr. Urso says, look, and it's a little bit of a distasteful quote, I apologize, but he says, I had to come up with a story. The guys in the U.S. are just crazy freaking right wing radical guys, fear the government. I have enough ammunition to kill the whole city of Dallas. I'm just kidding. But I just saying, I was trying to find a story because Nobu, if they go back over 14 years of history and the documents that were disclosed, they never see us. I'm just thinking ahead. We have to have a position. Similarly, Your Honor, it's not just them talking. It's the effort Mr. Urso put in to prepare Mr. Mutaguchi for interacting with the Japanese tax authority. Your Honor, it is particularly on the January 29th and the January 30th call, which with all respect, they objected to Your Honors hearing them live. They said snippets. You know, they said that we quote in their entirety. They objected and said the snippets were enough. But when you hear this, Mr. Urso says, I wrote every one of those questions and answers for a reason. Go memorize them, study them, answer the questions based on the answers I gave. And if you get a question that goes outside those, he helps him understand basically how to stall and back up. It's clear that neither side here has clean hands. Yes, sir. Yes, Your Honor. I apologize. You didn't represent Mr. Mutaguchi back in 2018 when he filed the false affidavit in the federal court there. I did not, Your Honor. What consequences is your client going to suffer when it's all said and done? Yes, Your Honor. Well, first of all, so he does regret that. And similarly, with the statement to the IRS, he has since told the IRS the truth. And that case has been resolved. There's a document, a document number 129, where the IRS says, you told us you're 50 percent. Then you told us that 100 percent. We believe the second version of your story. But, Your Honor, you're right that in this context, Mr. Mutaguchi received a benefit from this. But I think it comes back to the point that the California Supreme Court said in the case that I cited, that in additional cases where the California Supreme Court says the parties have to know that they don't get to run to the courts when they engage in an illegal agreement, and that if they have to rely on each other's goodwill, that maybe then they won't engage in this conduct. So, again, I'm not here to celebrate any aspect of this, but I do think that the law is clear for the integrity of the courts and the public's interest, the idea of rewarding one side or the other, as they say in impari delicto, even though that's not, that they stay where they lay. And that's where we are. And I, Your Honor, respectfully, similarly, there's that document. I think it's really important. Counsel mentioned this idea of an evolving plan. I think it's really important, a couple of points on that. There's a question and answer, Your Honor, that was put together, and it's in the record. As you said, you go to see it. There's a specific question in there, number 26, and it says, how are they formed? How are these companies formed? In what order? And Mr. Urso specifically has him say, it says, what was the sequence of formation of these entities? First, we created the three family trusts as BVI trusts on 27 December 2000. And, Your Honors, this is, you can find these, this Q&A is at 4ER 622 through 68. And I mention that because counsel mentioned the declarations and that there's a lot of facts in the declaration. They say one of them is don't lie. Well, respectfully, the district court did not weigh the evidence in an improper way. The district court looked at all of the evidence. So an affidavit or declaration, to Your Honor's point about what is required, there are general and vague statements in that affidavit. There are a number of paragraphs with background information. But on the key points, when they actually, there's three paragraphs in particular, 10, 12, and 14. When they actually get close to the truth, respectfully, and I know my client has his own issues, Your Honor, but it's legal, it blows up in their face. They have a problem with dealing with the actual reality. In paragraph 14, excuse me, 10, counsel mentioned a big deal of as of versus not backdated. Your Honors, in footnote six of the district court's opinion, the judge says, excuse me for saying you backdated because you guys on the call say you're backdating. And it's Mr. Urso, a lawyer, who says, no boo. It would be a terrible, these are his exact words, terrible, terrible mistake to tell the Japanese tax authority that we're just creating the documents. Tell them we've got the documents. If someone finds out that we backdated, his words, not mine, not counsel's, then we'll either, A, say we've always had this relationship and now we're just documenting it, or B, we lost the documents in this tri-star move, this company. But then he says, but they're never going to know who's going to tell them. It goes back to the three of us stick together. Respectfully, there are some points in there that Mr. Takagi knew something that they told him. If Your Honors just listen to the entire call the way the district court does, it's not working hard for this side, it's listening to the whole call. And that's appropriate in summary judgment. It's not twisting and turning or making credibility determinations. One of the calls where they say, Mr. Takagi, he feels fine, or he agrees, I believe it's the call where they are talking about the three of us stick together. The three of us stick together and we'll be fine. The district court judge is not required to put blinders on and take what counsel says, one snippet of a call, respectfully, you know, creates a genuine issue of material fact. Matsushita, at the end of the day, lays down the law in this context, which is when the court looks at the record as a whole, unless the rational trier of fact could find for that non-moving party, there is no genuine issue for trial. And there isn't here. And going back to the declarations in paragraph 14, they mentioned the 2018 IRS audit. They keep referencing in both their briefs, well, we got a clean bill of health from the IRS. Well, they don't tell you anything they said to the IRS. And I think if Your Honors look at document number 129, which was discussed at summary judgment hearing, the U.S. government will tell you what Mr. Urso, Mr. Fulmer told them about TPP. And that is that they were leery of submitting fraudulent documents to Japan. That's their case. That's not me. That's not counsel. That's the U.S. government saying Mr. Fulmer and Mr. Urso told us that. And similarly, Your Honor, just one other example in the declarations, going back to Mr. Takagi, there's in paragraph 12, there's reference to an email and that that email shows that Mr. Takagi knew what was going on. If Your Honors look at that paragraph, it's a company called Wasatch. And I mentioned this just because of the liberties I think that are taken here. Wasatch is a separate company. It's a Singaporean entity. It's an ER-237. It's an email. And Mr. Mutaguchi says that Takagi's feeling aggressive. That paragraph is clearly about a separate issue, a company called Wasatch, and that's a tax issue on a permanent establishment. There are at least three or four other records in summary judgment, four ER-622, three ER-447, and even Mr. Urso's own deposition testimony, two SER-330, where he makes clear he knows what Wasatch is. So they don't avoid summary judgment by saying this email says this, and if they disagree, it creates a genuine issue of material fact when that email on its face, along with documents they actually submitted or testimony they gave, recognizes and puts that in context. You never really answered my question about what consequences your client has faced. Yes, Your Honor. With respect to the declaration in Arizona, he has not faced any consequences for that. That's right. He has not. And with the IRS, he has. That document, document 129, will show out the penalties that he was assigned based on reporting. But again, and those are just the facts. But I think in terms of whether or not summary judgment was appropriate, and under California law, there's just clear that this is an unlawful purpose. And, you know, Your Honor's question about 95-5, again, those aren't my words or counsel's words. It's not just the numbers in the call. It says it's really 95-5. It's not 50-50. And that goes to Your Honor's question. I mean, we're actually talking about a company now worth tens of millions of dollars, and it only underscores Your Honor's question about why he would do that. And respectfully, this notion of another purpose to reward, the district court, it's not my, the district court summed it up best at hearing and talking to counsel, Mr. Tillerson. It's a gratuitous promise. It was a gratuitous promise at best. There was nothing to it. And at their own depositions, Your Honor, there are some key admissions, and we have these in our brief, some key admissions at their depositions, that they did not believe at any point from December 2000 through November 2013, that they individually or their family trusts had a 25% interest in TPP. My colleague asked them that directly, and they both admitted. And that's, that cite from Mr. Urso is at 2 S.E.R., 328 and 329. You know, and that goes to the other, counsel laid out three topics. I just wanted to address the third one, unless Your Honor's had any other questions. And that's a separate purpose. First of all, it was a gratuitous promise and nothing more. And the fact that when you look at those declarations, it's not enough under this Court's cases, under any Court's cases, and certainly under Matsushita. I also think of the analogy of the Hughes case. The tape recordings do blatantly, blatantly contradict the general statements that these guys make in their affidavits. And so with this, but even if the Court's cases are clear that when the central purpose is unlawful, that infects the entire agreement. And they cite a case where there's a severance, it's Cohen. But Cohen actually cites a California case where it says the purpose and the motivation to avoid a sever if you can is only if you have some sort of contractual relationship that is unlawful. So for those reasons, Your Honor, if you don't have, if there are no further questions from Your Honors, I respectfully ask Your Honors to affirm the trial court's grant of summary judgment. Let me just check with Judge Gould. Do you have any questions, Judge Gould? No questions. Okay. Good. Thank you for your time this morning, Your Honors. Mr. Patton? In rebuttal, this is simply not a summary judgment case. Illegality is often decided as a matter of law, and there's a lot of cases cited by the district court and opposing counsel that say that. But none of those cases involve a hotly disputed fact issue over the purpose of the parties entering into the contract. And so there is no authority out there that has been cited that supports what the district court did here in resolving that fact dispute. In fact, the California pattern jury charge even has a provision for potentially deciding whether a contract had an illegal purpose at trial as a matter of, for the jury to decide. I would direct the court to the SEC v. Pham case, which talks extensively about a declaration and what is sufficient in a declaration to raise a fact issue. I think that case is very instructive, that it is facts stated in a declaration on summary judgment have to be taken as true, all inferences from them have to be taken as true. And in that case, it was an SEC case alleging securities fraud. And they accepted as true the defendant's characterization of the transaction in the declaration. Same thing here. The declarations of Mr. Urso and Mr. Fulmer set out in detail this their version of this transaction and the facts that support that. And so the court cannot resolve that on summary judgment. On the recordings, two important points to leave the court with on the recordings. Number one, temporally, they are out of whack with when the key documents were signed. That is really important here because it is not as if there are recordings when they're sitting at the signing table, signing the documents and saying, oh, here's what we're going to tell the NTA or not tell them what we're going to do. They're months prior. The declarations set that out. That alone raises a fact issue as to whether or not that can be sufficient as a Mr. Mutaguchi's own characterization of those recordings. Because when asked in his deposition about a statement he made that he would rather have my clients own 50 percent of TPP than pay taxes to the NTA, his response was, oh, that was a joke. Those recordings were casual conversations among friends. You shouldn't take that seriously. That is in the record at ER 410. That is critical because his own characterization of these recordings shows that they are not the kind of evidence that the court can rely on for summary judgment. As a result, we would ask the court to reverse the district court's grant of summary judgment. Roberts. Thank you, counsel. This case is submitted and we are adjourned for the week.
judges: GOULD, BUMATAY, Collins